**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

CLEO H. SMITH, as Personal                                    CASE NO:
Representative of the ESTATE
OF DEMARCUS SEMER,
         Plaintiff,
v.

CITY OF FORT PIERCE, RALPH HOLMES,
and BRIAN MACNAUGHT.
         Defendant(s),
_____/

## COMPLAINT

The Plaintiff, CLEO H. SMITH, as Personal Representative for the ESTATE OF DEMARCUS SEMER, deceased, on behalf of said ESTATE and the survivors of DEMARCUS SEMER ("DEMARCUS"), hereby files this complaint against the Defendants, the CITY OF FORT PIERCE, FL, by and through the Fort Pierce Police Department ("FPPD"), and by and through its employees and agents, Sergeant BRIAN MACNAUGHT, Individually and in his Personal and Professional capacities, and Officer RALPH HOLMES, Individually and in his Personal and Professional capacities, and states as follows:

### CONDITIONS PRECEDENT

1. All conditions to Plaintiff's recovery have been performed or have occurred.

2. At all times material hereto, the Plaintiff has fully complied with the provisions of Fla. Stat. § 768.28 and in particular, presented a written Notice of Claim ("Notice") to the CITY OF FORT PIERCE.

3. CLEO H. SMITH is the duly appointed Personal Representative of the ESTATE OF DEMARCUS SEMER and is therefore authorized to bring this action on behalf of said

1

Estate.  Letters of Administration were issued on or about August 31, 2017.  A copy of the Letters of Administration is attached hereto and made a part hereof as **Exhibit A.**

## JURISDICTION AND VENUE

4. Jurisdiction exists in this Court, pursuant to 28 U.S.C. §1331 and §1343, as this action is brought under, inter alia, the Fourth and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. §1983 and §1985, to redress the deprivation of rights, privileges and immunities guaranteed to decedent DEMARCUS SEMER, by constitutional and statutory provisions.   Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. §1367, to adjudicate pendant claims arising under the laws of the State of Florida.

5. Venue is proper in this Court because the causes of action occurred within the Southern District of Florida.

## PARTIES

6. During all times material, DEMARCUS SEMER, decedent, was a person of the full age of majority, and a resident of Saint Lucie County, FL.

7. The potential beneficiaries of a recovery for the wrongful death of the decedent and their relationships to the decedent are as follows:

    a. LATRICIA MIDDLETON, biological mother of decedent.

    b. The ESTATE OF DEMARCUS SEMER.

8. During all times material, Defendant RALPH HOLMES was a member and employee of the Fort Pierce Police Department who worked within the Southern District of Florida as a police officer.

9. Defendant HOLMES is being sued in his individual and official capacity as an employee of the Fort Pierce Police Department.

2

10. During all times material, Defendant BRIAN MACNAUGHT was a member and employee of the Fort Pierce Police Department who worked within the Southern District of Florida as a police officer.

11. Defendant MACNAUGHT is being sued in his individual and official capacity as an employee of the Fort Pierce Police Department.

12. Defendant, CITY OF FORT PIERCE, is a municipality located in St. Lucie County, and operates the Fort Pierce Police Department ("FPPD").

13. The CITY OF FORT PIERCE, along with those listed below as "Policymakers", are responsible for the implementation of the police department's budget, policies, procedures, practices, training, instructions, equipment and customs, as well as any and all acts and omissions.

## NATURE OF THE ACTION

14. DEMARCUS SEMER was a young, unarmed man with a clean record, who was pulled over for speeding, attacked by two policemen, and shot to death.

15. The killers were so ruthless and aggressive that one of them, upon DEMARCUS having been pulled over for speeding, admits to "sneaking" up on the scene and then around the side of the vehicle, opening the passenger side door without SEMER realizing it, and entering the car without announcing himself, or having any legally justifiable reason to do so.

16. This gross violation of DEMARCUS' Fourth Amendment Right against unreasonable search and seizure prompted DEMARCUS to flee for his safety. **Although DEMARCUS was unarmed and displayed neither aggression nor a threat of any kind**, the policemen repeatedly attacked this young man multiple times with shockingly disproportionate means.

3

17. Despite glaring and material discrepancies from one account of the incident to another, it is certain that each officer fired his gun at the unarmed man, who simply may have been guilty of driving alone at night too fast and perhaps having a small amount of marijuana in his car.

18. One of the officers fired his Taser at DEMARCUS as well, however, it is uncertain which officer because Officer MACNAUGHT told differing facts.

19. What is certain beyond any doubt is that after being snuck up on, having his car opened and entered without warning, knowledge or a warrant, being aggressively confronted by the officers for a traffic issue, and being shot at multiple times, DEMARCUS logically believed that fleeing was his best option.  Submitting to the cops who had displayed unequivocally that they were not restrained by procedure or by law, and who had used deadly force on him merely for driving his car too fast, was a less reasonable option in the moment from DEMARCUS' perspective.

20. DEMARCUS was proven to be completely and tragically correct in trying to flee the two cops who displayed an unrelenting and evident thirst for action, confrontation, or for more than that.

21. Officer MACNAUGHT fired the deadly shot squarely into DEMARCUS' back as he ran with his arms outstretched in the air away from the officer.

22. This unequivocally evidences that the officers were not equipped nor trained to exercise restraint.

23. Statements by both the Chief of Police for the Department and by the Use of Force Expert, hired for the official investigation and grand jury, fault the officers for their needless aggression based on the simple fact that DEMARCUS ought to have been permitted to

flee, because he was just speeding and maybe had a little marijuana, and the officers had his Driver's License, and could have just found him later.

24. The sad truth is that it comes as no surprise to anyone who hears about the incident that the deceased was African-American, that those responsible for the homicide were policemen, that the victim never had a weapon, that the police used the tired excuse that they mistook a cellphone for a gun, or that the victim was killed with a gunshot into his back as he ran from cops who had initiated the aggression by illegally invading his vehicle.

25. The facts are simply not reconcilable with the officers having the slightest regard for the safety and welfare of DEMARCUS, nor with there having been any justifiable, non-discriminatory reason for Defendant MACNAUGHT to have provided unsolicited back-up for a traffic stop for speeding, by "sneaking" around the passenger's side of the vehicle, and opening the car door secretly, in clear violation of police procedure and the Fourth Amendment.

26. This action is brought on behalf of DEMARCUS SEMER against the Defendants in order to seek redress for profound deprivations of DEMARCUS' constitutional rights by Defendants HOLMES and MACNAUGHT and the FPPD.

27. The Plaintiff brings suit for excessive and deadly force resulting in the unlawful shooting death of DEMARCUS SEMER, under the color of law, in violation of his rights under the Fourth and Fourteenth Amendments of the United States Constitution, and in violation of his Civil Rights pursuant to 42 U.S.C. § 1983.

28. Plaintiff alleges that the City of Fort Pierce, namely the FPPD, and its policy makers, including the City Commission, Mayor, City Manager, the Police Chief, and the other ranking officers in command (collectively referred herein as the "Policymakers") failed to

properly train, supervise, screen, discipline, transfer, counsel or otherwise control officers who are known, or who should have been known, to engage in the use of excessive force and/or deadly force, including those officers repeatedly accused of such acts. The Defendants had a duty, but failed to implement and/or enforce policies, practices, orders, rules, regulation and procedures for the FPPD that would have protected Plaintiff and prevented the violations of his constitutional rights which caused his tragic death.

29. Defendants, and most notably, the Policymakers, failed to adequately prepare Defendants HOLMES and MACNAUGHT by inadequately training, supervising, and equipping them, and deficiently implementing, instructing, and enforcing compliance with policies necessary to protect civilians during encounters with officers, including traffic stops.

30. The government hired an expert that deemed the traffic stop trainings and the FPPD's tactics inadequate in multiple respects.

31. According to the Chief of the Department, a pattern of procedural violations existed and were being committed by these officers.

32. The Chief's tenure began recently, and thus well after the officers' training, and after their deficient grasp and adherence to procedure was formed and exhibited.

33. The officers were cited for 15 violations of procedure by the Department arising out of this incident, and there were multiple other procedural violations and episodes of misconduct, particularly of lying to superiors and investigators, in which investigators either ignored or missed, due to an inadequate investigation.

34. Defendants consciously disregarded the rights of Plaintiff by ignoring procedures and law, and believing that the Policymakers would approve of, or at least not object to, their actions.

35. Defendants' wanton and reckless behavior was not only needless and deadly, but also far below the levels our Constitution requires.

36. The evidence already collected is frightening, and so too is the manner in which the Department and its officers have fought against The Police Chief's efforts to terminate these officers, despite an inadequate investigation of the shooting, which is symptomatic of the flawed Departmental culture which encourages noncompliance with procedures and promotes unnecessary violence.

37. The City of Fort Pierce has a dubious record, which does not include a single determination of a "bad shooting" by an officer, nor a single discharge of an officer following a shooting within the 15 years preceding this incident.

38. Following an investigation that should make every member of the FPPD hang their collective heads in shame, and the rebuffing of the Chief's attempt to let go of officers she deems substandard, it is evident that The Department's pattern of disregard for safe police procedure, training, and supervision still exists today.

## FACTS

39. On April 23, 2016, just before midnight, DEMARCUS SEMER, was driving his car east on Avenue G in Fort Pierce, FL.

40. DEMARCUS was a talented musician who was driving alone in the vehicle to meet a group of friends with whom he had formed a band.  As DEMARCUS drove towards his bandmates' home to join them in playing video games, Defendant HOLMES laid in wait in his patrol car, observing traffic on the side of the road with the lights off.  HOLMES decided to stop and pull DEMARCUS over in a residential neighborhood for speeding.

41. Defendant HOLMES subsequently claimed that he had "visually estimated" the car to be traveling at 45 miles per hour in a 25 mph zone, an assertion incapable of verification due

to his failure to use a radar gun.  Standard police procedure for officers who are secretly monitoring traffic involves use of a radar detector, which HOLMES claimed to use to confirm the speed.

42. Defendant HOLMES did not observe any other traffic violations of any kind after pulling behind DEMARCUS.

43. The Defendant policemen have offered their version of the events which followed through statements and sworn testimony, however, there is no doubt that Defendant CITY OF FORT PIERCE's Police Department failed to equip the car driven by HOLMES, or that of the other officer who arrived later, Defendant MACNAUGHT, with a functioning "dash cam" and the ability and knowledge needed to use one.

44. The use of "dash cams" has become appropriate and standard for police departments as they are inexpensive and valuable for evidence gathering, training, and protection of citizens such as DEMARCUS, who are stopped by the police.  There was no rational, good faith reason for the FPPD to have failed to utilize a "dash cam" in the subject police vehicle, or for Defendant HOLMES and his superiors to have failed to make appropriate efforts to correct that failure.

45. Without question, the largest benefit which the Defendants might derive from not having a working "dash cam" is to inhibit any monitoring or investigation of a traffic stop.  In addition to the fact that Defendants effectively eliminated the driver's account of the stop by killing him, their failure to use a "dash cam" served to eliminate a crucial potential source of evidence which might have refuted the officers' account.  Furthermore, Defendants' failure to evidence the encounter did not stop there as they also failed to utilize commonly employed "body cams" which also would have objectively recounted what occurred.

46. In a display of irony, the Department's investigation faulted Officer MACNAUGHT for actually having a body camera.   That camera was several years old from the officer's SWAT duties and while it was not in use and tucked away in his vehicle's truck, it evidences that the DEPARTMENT's failure to have had a body cam on the officer who shot DEMARCUS is inexcusable.

47. Mathematically speaking, the odds of the subject, body cams on each officer and dash cams on both cars being eliminated purely by coincidence are seriously low.

48. Once DEMARCUS stopped his vehicle upon Defendants' instruction, Defendants committed a string of violations of Departmental policy which was so egregious that the Police Chief fired them both.

49. Initially, HOLMES claims to have gone up to the driver's side window to attempt to speak with SEMER, then noticed a small amount of marijuana "shake" in the vehicle along with a cellphone on the dashboard.

50. Holmes didn't notice any weapons and, in fact, neither officer has ever stated that he saw a gun or anything which appeared like it might be a gun in the car or on SEMER's person while he was in the vehicle.  Similarly, neither officer reported having seen any ammunition, gun case, gun cleaning material, or any other firearm accessory.

51. HOLMES claims he then attempted to have DEMARCUS exit the vehicle a few times, and DEMARCUS refused each time.  At that point, HOLMES had already committed another violation of FPPD's policies in that they had failed to instruct DEMARCUS to place his car in park and to turn off his engine.

52. HOLMES then committed another procedural violation by reaching into the vehicle multiple times and attempting to open the car door.

53. Meanwhile, MACNAUGHT, who had pulled up behind the vehicles, went around to the passenger-side window, and in another blatant policy violation, opened the passenger side's door in a stealthy manner.  MACNAUGHT admitted that he opened the door in order to conduct a secretive search of the vehicle, including to make sure no one was in the back seat.

54. The Government's Expert on Use of Force questioned the reasonableness of MAC-NAUGHT's claimed motivation for his unilateral opening of the door and entry, as his actions in doing so are wholly inconsistent with a desire to promote safety by excluding the alleged possibility of a person in the back seat.  MACNAUGHT's conduct was unsafe and put him in jeopardy, and his reasoning for doing so was a pretense.

55. MACNAUGHT claims to then have announced himself to DEMARCUS before trying to convince him to leave the vehicle.  DEMARCUS was startled to see his door open and the officer suddenly inside the vehicle next to him unannounced.  MACNAUGHT's version of the events involves him then announcing himself to DEMARCUS at this point.

56. However, it is unlikely that MACNAUGHT's version of events would be taken as necessarily accurate by the trier of any fact due to his having blatantly and demonstrably lied about the details of the subject incident while giving his statement under oath to investigators.

57. MACNAUGHT was fired from the police force around the time of the false statement, and it would be clear to any investigator that his facially false statements were manufactured to cover up the cause of DEMARCUS's death.  The FPPD's failure to act upon MACNAUGHT's lies, or to even point them out during the investigation or as part of their findings, was either part of a cover-up of the Department's responsibility for the killing,

or a complete and utter failure by the Department to conduct a legitimate or adequate investigation.

58. MACNAUGHT admits to actually getting into the car via the passenger side's door, which he tries to justify by claiming that he did so because DEMARCUS was preparing to drive off.  Forcing himself into a driver's car through the passenger's side during a routine traffic stop for speeding was another gross violation of Department policy.

59. According to the officer's own accounts, DEMARCUS had not been violent and there was no discussion of him being threatening in any way with either officer before MAC-NAUGHT shocked the man by opening his passenger side door and diving in.  While HOLMES claims he did see a small amount of loose marijuana "shake" in the car, MAC-NAUGHT has conceded he neither saw nor smelled any, and initially believed they might simply detain SEMER and not arrest him.

60. An ordinary, reasonable person such as DEMARCUS knows enough about police officers and how they conduct traffic stops to know that MACNAUGHT's conduct at that point was unusual, overly aggressive, foolish, and procedurally improper.  MACNAUGHT was also undoubtedly aware of an important fact that ordinary people are fully cognizant of from life experience and certainly from television and movies:  Cops aren't supposed to just forcibly enter your home or vehicle without a warrant.

61. MACNAUGHT's action of taking it upon himself to enter DEMARCUS' vehicle through the passenger side would be frightening to any ordinary person because they would immediately recognize that the officer was operating outside of the law and normal police procedure while displaying unwarranted aggression.

62. MACNAUGHT also knew that DEMARCUS was African-American, and was aware of the current climate in which police officers harming African-American men was so

prevalent.  Being as MACNAUGHT must have realized that DEMARCUS would logically have an augmented sense of fear from conduct so grossly violative of procedure, and yet still deliberately and illegally invaded his car, then it is reasonable to conclude that he was indifferent to DEMARCUS' rights.

63. MACNAUGHT went from initially thinking about letting DEMARCUS go, to invading his car and attacking him with the only change in circumstances being that Defendant HOLMES noticing a small amount of marijuana.

64. In case it needs to be said, possession of a small amount of marijuana, like DEMARCUS had, is legal for some of the population in 29 states, including Florida, decriminalized in 12 states, and in Miami, Orlando and Tampa, and fully legal in 9 states and the District of Columbia.

65. As their Chief stated, they could have let DEMARCUS leave.

66. Further, at the time MACNAUGHT invaded SEMER's car, there is no way he could have been sure that DEMARCUS did not possess the marijuana for medical purposes.

67. Though this may not have technically made the small amount of shake in DEMARCUS' car necessarily legal for him to possess, it does further evidence how overboard Defendants went, and that they must have known their actions were grossly disproportionate to the only crime they suspected.

68. It is unconscionable and demonstrative of uncontrolled aggression, not to mention a violation of Department policy, for the Defendants to initiate a physical altercation with DEMARCUS over such a low level misdemeanor, if there ever was one.  Their escalation of force, even beyond that, demonstrated a malicious motive likely borne out of frustration that someone dared not succumb to their authority, and caused them to have clouded judgment and anger and malice enough to shoot at him.

69. Upon entering the car, MACNAUGHT concedes to have had a physical altercation with DEMARCUS as he tried to force DEMARCUS out.  Again, this must have been terribly frightening to DEMARCUS, as most anyone recognizes that proper procedure for policemen does not include invading cars and getting physical in such a manner with people they pull over for speeding who are not guilty of anything more.

70. At this point in time, it would occur to an ordinary, reasonable person like DEMARCUS that MACNAUGHT's conduct up to this point evidenced he was more than willing to ignore police procedure AND to use physical force without regard for any limitations imposed by the Department and by the law.  Taken together, Defendants' actions constituted a pattern of conduct as it pertains to DEMARCUS, which justifiably and expectedly made him fearful of imminent physical harm.

71. After he was unable to physically force DEMARCUS to submit to his will, MACNAUGHT claims in his interview to have drawn his Taser and shot DEMARCUS. Firing one's Taser while confined inside a citizen's car was still another instance of conduct violative of Departmental procedure by Defendants.  Additionally, because the TASER apparently did not hit DEMARCUS directly, it left him conscious, mobile, fearful, and wondering what most anyone would at this point: What will these cops do next?

72. The conduct of these officers to this point, based almost exclusively on their own testimony, was objectively frightening.  Eliminating functional dash cams, body cams for each officer, a radar gun, and the victim himself as possible sources of evidence illustrated a pattern by the FPPD of acting deliberately and consciously with disregard for the safety of others.

73. Furthermore, Officer MACNAUGHT clearly informed the first officer on the scene, Detective Streeter, that HOLMES fired the Taser and not him.  Detective Streeter indicated that he was positive this was what MACNAUGHT told him.

13

74. In the alternative, even if any of these instances of failing to act to keep their citizens safe is indeed coincidental and not part of a pattern, then any one or more of the measures would still have been intended to cover-up police crimes.  Regardless of the extent with which the FPPD fails to supply inexpensive cameras or fails to adequately train its officer not to shoot people in the back while they run away, the pattern of reckless and deliberately indifferent activity during the subject traffic stop by the Defendants is evident.

75. The escalating conduct detailed to this point continued only to get more outrageous while MACNAUGHT grappled with DEMARCUS in the car.  According to the officers' testimony, HOLMES fired multiple gunshots into the car while DEMARCUS and MACNAUGHT struggled.  Neither officer reports ever having seen any weapon in the vehicle or on DEMARCUS' person while inside the vehicle.  MACNAUGHT, however, claimed in sworn testimony that he believed at the time that DEMARCUS fired the shots from some unseen weapon he had drawn during their physical altercation.

76. MACNAUGHT testified that he heard the gunshots while fighting with DEMARCUS, while the man was driving his car away with one hand while using his opposite hand to fight MACNAUGHT.

77. First off, MACNAUGHT's testimony of DEMARCUS fighting him with one hand while driving his car with the other makes his claim to have believed DEMARCUS also drew and fired a gun impossible.  Clearly, the gunshots could never have made MACNAUGHT truthfully believe the Plaintiff was firing a gun because MACNAUGHT knew the obvious fact all along that the Plaintiff had no hand free to do so with.

78. MACNAUGHT's lie, told to justify his claim that he believed DEMARCUS had a gun when he tried to run away, was one the Defendants' investigators and detectives surely recognized, and yet did not act upon or bring to light.  Furthermore, MACNAUGHT would

14

have had to have something beyond extremely good fortune to have missed being shot by one of the three shots if DEMARCUS had fired them.  DEMARCUS would have been shooting from point blank range as he sat right next to MACNAUGHT in the car with one of his (three?) hands on him.

79. Thus, even if it really never occurred to MACNAUGHT that the Plaintiff did not actually have a way to hold this invisible gun, he must have recognized by the absence of the smell of gunpowder or deafening sound that DEMARCUS had not been fired multiple times at him by the man sitting next to him at arm's length.

80. In order to protect itself from liability, Defendant CITY OF FORT PIERCE used a police officer from a local agency to conduct an "experiment," devoid of any scientific credence, in which he fired a gun from within a car and from outside a car to see if MACNAUGHT really believed that shots fired outside the car were fired inside the car.  The fellow officer concluded that MACNAUGHT could have thought the shots were actually coming from the person two feet away, and not from outside the car.

81. The preparation and presentation of this "test" was a complete sham that CITY OF FORT PIERCE knowingly utilized to cover up the shooting, and that was used to improperly influence the grand jury by substituting the wholly subjective "judgment" of a hired local policeman for that of the jury through use of a pseudo-scientific "experiment" that lacked any control or evidentiary value.  The fact that a prosecutor presented the grand jury this bare-bones testimony of another local officer as to what he judged the reasonableness of MACNAUGHT'S perception to be – based not even on his knowledge or experience, but rather a ridiculous, uncontrolled "experiment" – is proof positive that THE CITY OF FORT PIERCE manipulated this investigation and prosecution in violation of the Constitution.

82. As mentioned previously, it is not even certain that MACNAUGHT used the Taser, based on his statements to the contrary at the scene when his memory was fresh.  He also had not had the three days to prepare prior to his official interview, and the opportunity to work with HOLMES, union personnel, and their lawyers, to formulate a narrative sufficient to exonerate them.

83. If HOLMES was indeed the one firing the TASER, which is consistent with the leads for the TASER being discovered outside the driver's door where HOLMES was, as opposed to inside the vehicle where MACNAUGHT was, then it would have been unlikely for HOLMES to also have had the opportunity to shoot his gun at the occupied vehicle.

84. Regardless, HOLMES having been the one to fire the TASER definitively negates MACNAUGHT's claim that he shot his Taser because he believed DEMARCUS fired a gun in the car.  In that case, the fact is he would have fired no weapon because he never really believed he was shot at.

85. The Government's Expert, Geoffrey Alpert, calls MACNAUGHT's account into question, despite his shockingly never having been given Detective Streeter's account to review. Dr. Alpert raised the mystery question of why the officer would have returned gunfire with a Taser, which obviously would be disposed of logically if MACNAUGHT was being truthful at the scene after the shooting.

86. HOLMES' conduct evidences failure after failure of the Department to take action to instill responsibility in HOLMES to follow procedure.  This repeated failure to act and take stern disciplinary action, evidences the Department's broken disciplinary system plagued by supervision, which is repeatedly indifferent to procedure being followed by the Department's rank and file.

87. Two other incidents involving HOLMES serve to further illustrate the Department's willful tolerance of improper procedure.  On one of the occasions, when HOLMES missed work, he was discovered drunk and at a ballgame.

88. Being as most people have never simply just not shown up for work as HOLMES has repeatedly, it is fair to say that many would consider it very difficult to believe that the FPPD's procedures and disciplinary system was so lax so as to allow an officer to be paid to "protect and serve" after they skipped work in order to get drunk.

89. Also illustrative of a Department that has no care or regard for the enforcement of proper police procedure is the fact that HOLMES's personnel files reflects another incident in which he was suspended for two days, however, lacks any specifics nor details.  A Department concerned with overseeing and disciplining officers would never allow such deficiency in their disciplinary records.

90. One need look no further than this lawsuit or the determination made regarding HOLMES' discipline in this matter to realize that accurate record keeping of past discipline is essential for both future discipline and to illustrate the Department actually takes discipline seriously.

91. When HOLMES started shooting at the car, DEMARCUS, who was already wondering what MACNAUGHT's next attack would be following the Taser, then realized bullets where flying at him from HOLMES.

92. Justifiably fearful he was in immediate and severe danger, DEMARCUS grabbed the cellphone MACNAUGHT saw on the dashboard, and fled the vehicle.  At this point DEMARCUS was fully aware that HOLMES was trying to shoot him to death and likely believed, and justifiably so, that MACNAUGHT was also about to try to shoot him down.  MAC-

NAUGHT's escalating, aggressive behavior had reached a point where shooting his firearm was the only measure left for him that would comport with the escalating nature of behavior he had displayed.

93. The severity and the multitude of improper actions by the officers evidence a lack of both training and of regard for the lives of those they were sworn to protect, including that of DEMARCUS SEMER.

94. The pattern and extent of the Defendant officers' illegal actions and violations of Department procedure were of sufficient extent and severity so as to constitute Constitutional violations.

95. These officers were trained and experienced policemen who were either so poorly trained and supervised that they did not know their conduct was improper and dangerous, or the officers were completely unconcerned with the propriety of their conduct due to a wholesale and deliberate indifference at the FPPD to supervision, training, and the general maintenance and practice of proper police procedure within the Department.  Beyond violating technical rules, the officers' actions were needlessly aggressive several times over to the point that they made DEMARCUS legitimately afraid for his life.

96. In that same vein, one of the officers committed yet another serious violation of procedure: the possession of a non-departmental firearm.  This demonstrates a serious lack of regard for procedure designed to protect the rights of citizens.  Though admittedly difficult to divine a purpose for the improper firearm, the possession of it alone disregards a requirement that ensures that ballistic matches may be made to departmental firearms and assigned to the officer responsible in an accurate manner.  A shot from an outside weapon would be difficult to match, and allow for the possibility of an officer's shooting to be unattributed.

18

97. The Defendants' illegal, improper, and dangerous acts drove DEMARCUS to flee the scene in an effort to save his own life.  Unfortunately, DEMARCUS was correct to fear for his life from the policemen, but even correctly sensing their unbridled aggression and the danger they posed was not enough to save his life.  As DEMARCUS ran away, MAC-NAUGHT exited the vehicle and fired several shots at him from behind.  Defendant MAC-NAUGHT hit DEMARCUS with one of the bullets, fatally wounding him with a shot that travelled from an entry in the flat part of the back and traveled up and through arteries leading down from his heart.

98. MACNAUGHT claims that he shot DEMARCUS because the deceased turned around and faced him and started moving towards him while waving what he thought looked like a gun in one of his outstretched hands.  However, MACNAUGHT was not only wrong about a gun being present, but his sworn justification for thinking such is patently untrue based on his having been admittedly unable to mention which of DEMARCUS's hands the "gun" was in.

99. It is clear that DEMARCUS never had a gun, and MACNAUGHT never actually believed that DEMARCUS had a gun, considering, in addition to other facts alleged in the Complaint, the fact that no weapon was ever found at the scene; the investigator's only hypothesis was that DEMARCUS had a cellphone in his hand that MACNAUGHT mistook for a gun; no cellphone was found at the scene of the shooting for several hours; no cellphone appears on the evidence log taken after the shooting; MACNAUGHT testified he never saw DEMARCUS with his cellphone despite sitting right next to him; no other witness was relied upon in the various reports as having believed to have seen DEMARCUS with a gun; neither the Defendants nor anyone else reported hearing or seeing gunshots from

DEMARCUS and MACNAUGHT's story concerning his claimed belief that DEMAR-CUS had a gun contains glaring contradictions from other statements.

100. The bullet wound in DEMARCUS' back was in no way close to his side or chest. It was, without question, that MACNAUGHT shot DEMARCUS right in the back. The position of the bullet wound demonstrates that DEMARCUS was not turning when MAC-NAUGHT fired.  It strains credulity for MACNAUGHT not to know which hand the person he shot and killed was supposedly threatening him with.  Furthermore, it is inconsistent for the deceased to have been charging towards the officer with an outstretched arm, and yet for the bullet to strike him right in the back.  The location of the deceased's wound evidences that MACNAUGHT was covering up the improper nature of the shooting by fabricating an attack with an am outstretched by DEMARCUS.

101. Defendants MACNAUGHT, HOLMES, and other officers at the scene of the shooting incident were acting under color of law, and acting pursuant to customs, practices, and policies of the CITY OF FORT PIERCE and the FPPD, in regards to the use of deadly force as authorized and/or ratified by the Policymakers.  DEMARCUS was deprived of rights and privileges secured to him by the United States Constitution and by other laws of the United States, by the CITY OF FORT PIERCE's failure to provide proper training, adequate supervision, or discipline in dealing with individuals such as DEMARCUS in violation of 42 U.S.C. §1983, and related provisions of federal law and in violation of the above cited constitutional provisions.

## COUNT I - EXCESSIVE FORCE BY DEFENDANT MACNAUGHT
### (Individually and in his official capacity)

### COUNT 1 – 42 U.S.C. § 1983

102.   Plaintiff incorporates by reference paragraphs 1 through 101 as if fully set forth herein. Plaintiff would show that Defendant MACNAUGHT's actions on the occasion in question were wrongful, malicious, and reckless in depriving DEMARCUS of his constitutional rights, as alleged more fully below.

103.   At all times material hereto, Defendant MACNAUGHT had a duty to avoid infliction of unjustified bodily injury to DEMARCUS, to act to protect him from known or obvious harm, and to not violate his constitutional rights.

104.   Defendant MACNAUGHT failed to act as a reasonable officer would have acted in the same or similar circumstances.

105.   Defendant MACNAUGHT, without justification and the need to do so, used excessive and deadly force as described above, and killed DEMARCUS without legal justification. DEMARCUS never made any threatening gestures toward Defendant MACNAUGHT, never had a weapon of any kind, had not been suspected of committing a felony or crime involving violence or potential harm to others, and did not pose an immediate threat to the safety of Defendant MACNAUGHT or others.

106.   Defendant MACNAUGHT was not provoked when he entered Plaintiffs' car, became physical with Plaintiff, shot him with a Taser, and certainly not when he fired multiple shots from his service weapon at him while he ran away.  DEMARCUS died as a result of the gunshot wound to his back for no lawful or justifiable reason.

107.   The excessive and deadly force used by Defendants was not reasonable, justified, nor necessary under the circumstances.

108. Defendant MACNAUGHT's actions were not objectively reasonable because he followed a procedure designed to inflict excessive and deadly force in a non-life threatening situation.

109. Defendant MACNAUGHT denied DEMARCUS his right to be free from the use of excessive force in violation of the Fourth Amendment to the United States Constitution.

110. MACNAUGHT's actions, including his sneaking into the vehicle, attacking DEMARCUS in the car, firing his Taser, and shooting him as he fled, were not actions a competent police officer would take.

111. A reasonable officer would have recognized that said actions were violative of DEMARCUS's clearly established rights.

112. The force used by Defendant MACNAUGHT was unnecessary, excessive, and unreasonable under the circumstances, as SEMER did not pose a threat to the safety of Defendant MACNAUGHT or others and the use of such excessive and deadly force was unnecessary.

113. Defendant MACNAUGHT embarked on an outrageous course of conduct with a reckless, intentional, deliberately indifferent, knowing and conscious disregard that it would cause and, in fact, caused DEMARCUS to suffer extreme and severe mental and emotional distress, agony, anxiety, fear for his safety and his life.

114. Defendant MACNAUGHT's conduct from the beginning of the incident forward revealed a multitude of procedural improprieties and illegal conduct that was so pervasive so as to evidence a lack of proper training, supervision, and operation, discriminatory or other animus and/or a motive to intentionally harm the Plaintiff.

115. The evidence from experts in law enforcement is expected to demonstrate that no ordinary and objective professional law enforcement officer is the least bit likely to just "mess up" as badly as these officers did.

116. As a result of these Constitutional violations to DEMARCUS and the injuries he sustained, Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## COUNT II – DISCRIMINATION BY DEFENDANT MACNAUGHT
### (Individually and in his official capacity)

### COUNT 1 – 42 U.S.C. § 1983

117. Plaintiff incorporates by reference paragraphs 1 through 116 as if fully set forth herein. Plaintiff would show that Defendant MACNAUGHT's actions on the occasion in question were wrongful, malicious and reckless in depriving DEMARCUS of his constitutional rights, as alleged more fully below.

118. At all times material hereto, Defendant MACNAUGHT had a duty to avoid infliction of unjustified bodily injury to DEMARCUS, to act to protect him from known or obvious harm and to not violate his constitutional rights.

119. Defendant MACNAUGHT failed to act as a reasonable officer would have acted in the same or similar circumstances.

120. Defendant MACNAUGHT, without justification and the need to do so, without legal justification, without a warrant, without any threatening gestures toward anyone, without any indication of a weapon of any kind, without actual or reasonable suspicion of committing a felony or crime involving violence or potential harm to others, and without any real threat to the safety of others, employed covert "sneaking" around the back of Plaintiffs' vehicle and then infiltrated it.

121. Defendant MACNAUGHT was not provoked when he entered Plaintiffs' car, became physical with Plaintiff, shot him with a Taser, and certainly not when he fired multiple shots from his service weapon at him while he ran away.  DEMARCUS died as a result of the gunshot wound to his back for no lawful or justifiable reason.

122. The excessive and deadly force used by MACNAUGHT was not reasonable, justified nor necessary under the circumstances.

23

123. Defendant MACNAUGHT's actions were not appropriate nor motivated by any non-discriminatory rationale, because he followed a totally unnecessary, severe and provoking course of action without any legitimate reason.

124. Defendant MACNAUGHT denied DEMARCUS his right to be free from discrimination in violation of the Fourteenth Amendment to the United States Constitution.

125. MACNAUGHT's actions were not those a competent police officer would take absent discriminatory intent and/or policy or custom.

126. A reasonable officer would have recognized that said actions were violative of DEMARCUS's clearly established rights.

127. The tactics used by Defendant MACNAUGHT was unnecessary, excessive, illegal, and unreasonable under the circumstances, as DEMARCUS did not pose a threat to the safety of Defendant MACNAUGHT or others.

128. Defendant MACNAUGHT embarked on an outrageous course of conduct with a reckless, intentional, deliberately indifferent, knowing and conscious disregard that it would cause and, in fact, caused DEMARCUS to suffer extreme and severe mental and emotional distress, agony, anxiety, fear for his safety and his life.

129. Defendant MACNAUGHT's conduct, from the beginning of the incident forward, revealed a multitude of procedural improprieties and illegal conduct that was so pervasive that it evidenced a lack of proper training, supervision, and operation, discriminatory or other animus and/or a motive to intentionally harm the Plaintiff.

130. The evidence from experts in law enforcement is expected to demonstrate that no ordinary and objective professional law enforcement officer is the least bit likely to just "mess up" as badly as these officers did.

131.  As a result of these Constitutional violations to DEMARCUS and the injuries he sustained, Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## COUNT III - EXCESSIVE FORCE BY DEFENDANT HOLMES
### (Individually and in his official capacity)

### 42 U.S.C. § 1983

**132.**  Plaintiff incorporates by reference paragraphs 1 through 131 as if fully set forth herein. Plaintiff would show that Defendant HOLMES's actions on the occasion in question were wrongful, malicious, and reckless in depriving DEMARCUS of his constitutional rights, as alleged more fully below.

133.  At all times material hereto, Defendant HOLMES had a duty to avoid infliction of unjustified bodily injury to DEMARCUS, to act to protect him from known or obvious harm, and to not violate his constitutional rights.

134.  Plaintiff will show that Defendant HOLMES failed to act as a reasonable officer would have acted in the same or similar circumstances. Defendant HOLMES, without justification, used excessive and deadly force as described above, and killed DEMARCUS without legal justification.

135.  DEMARCUS never made any threatening gestures toward Defendant HOLMES, never had a weapon of any kind, had not been suspected of committing a felony or crime involving violence or potential harm to others, and did not pose an immediate threat to the safety of Defendant HOLMES or others.

136.  Defendant HOLMES was not provoked when he fired multiple gunshots at the Plaintiff as he sat in his car, after he pulled the Plaintiff over for speeding, and may have saw a little marijuana.  DEMARCUS died as a result of the officer's gunshots for no lawful or justifiable reason.

137. The excessive and deadly force used by Defendants was not reasonable, justified, nor necessary under the circumstances: a traffic stop for speeding.

138. Defendant HOLMES's actions were not objectively reasonable because he followed a procedure designed to inflict excessive and deadly force in a non-life threatening situation.

139. Defendant HOLMES denied DEMARCUS his right to be free from the use of excessive force in violation of the Fourth Amendment to the United States Constitution.

140. HOLMES' actions, including, but not limited to, his reaching into the vehicle, firing his gun at the car, firing his Taser, not letting the Plaintiff leave, and failing to turn off the car, were not those a competent police officer would take.

141. A reasonable officer would have recognized that said actions were violative of DEMARCUS's clearly established rights.

142. The force used by Defendant HOLMES was unnecessary, excessive, and unreasonable under the circumstances, as DEMARCUS did not pose a threat to the safety of Defendant HOLMES.

143. Defendant HOLMES embarked on an outrageous course of conduct with a reckless, intentional, deliberately indifferent and knowing and conscious disregard that it would cause, and in fact, caused DEMARCUS to suffer extreme and severe mental and emotional distress, agony, anxiety and fear for his safety and his life.

144. Defendant HOLMES's conduct from the beginning of the incident forward revealed a multitude of procedural improprieties and illegal conduct that was so pervasive so as to evidence a lack of proper training, supervision, and operation, discriminatory or other animus and/or a motive to intentionally harm the Plaintiff.

145. The evidence from experts in law enforcement is expected to demonstrate that no ordinary and objective professional law enforcement officer is the least bit likely to just "mess up" as badly as these officers did.

26

146. As a result of these Constitutional violations to DEMARCUS and the injuries he sustained, Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**COUNT IV – FAILURE TO INTERVENE BY DEFENDANT HOLMES**
**(Individually and in his official capacity)**

**42 U.S.C. § 1983**

**147.** Plaintiff incorporates by reference paragraphs 1 through 146 as if fully set forth herein. Plaintiff would show that Defendant HOLMES's actions on the occasion in question were wrongful, malicious and reckless in depriving DEMARCUS of his constitutional rights, as alleged more fully below.

148. Defendant HOLMES had a duty to intervene and protect DEMARCUS from infliction of unjustified bodily injury, to act to protect him from known or obvious harm, and to not try to prevent violation of his constitutional rights.

149. Defendant HOLMES, without justification or cause, failed to take action to stop MACNAUGHT as he used excessive and deadly force as described above and killed DEMARCUS without legal justification. DEMARCUS never made any threatening gestures toward Defendants, had not been suspected of committing a felony or crime involving violence or potential harm to others, never had a weapon of any kind, and did not pose an immediate threat to the safety of Defendant HOLMES or others.

150. Defendant MACNAUGHT's actions in invading the Plaintiff's car and getting into a physical altercation with him were obviously disproportionate and unnecessary.

151. HOLMES violated DEMARCUS' rights by failing to intervene and inform MACNAUGHT that the Plaintiff was pulled over for a minor infraction, and there was no evidence of a threat or any crime justifying physical force.

27

152. Defendant HOLMES was not facing an imminent threat of danger when he fired multiple gunshots at DEMARCUS as he sat in his car.  This dangerous and incompetent conduct by HOLMES created a false illusion and/or justification to MACNAUGHT that DEMARCUS had a firearm and thus posed a danger.  Giving MACNAUGHT the false belief that DEMARCUS was firing a gun violated his responsibility to protect DEMARCUS' constitutional rights.

153. DEMARCUS died as a result of HOLMES' violations of DEMARCUS' rights by failing to stop HOLMES from sneaking around the car and entering it unannounced, and by firing gunshots into the occupied vehicle and giving the false impression DEMARCUS was armed instead of stopping MACNAUGHT.

154.  The excessive and deadly force used by Defendants was not reasonable, justified nor was it necessary under the circumstances described herein.

155. A reasonable officer would have recognized that the aforementioned actions were violative of DEMARCUS's clearly established rights.

156. The officers' actions were not those a competent police officer would take.

157. Defendant HOLMES denied DEMARCUS his right to be free from the use of excessive force in violation of the Fourth Amendment to the United States Constitution.

158. The force utilized by MACNAUGHT and observed by HOLMES was unnecessary, excessive and unreasonable under the circumstances.

159. Defendants embarked on an outrageous course of conduct with a reckless, intentional, deliberately indifferent, and knowing and conscious disregard that caused DEMARCUS to suffer extreme and severe mental and emotional distress, agony, anxiety, and fear for his safety and his life.

160. Defendants conduct from the beginning of the incident forward, including HOLMES' failure to protect Plaintiff, revealed a multitude of procedural improprieties and illegal conduct that evidenced a lack of proper training, supervision, and operation.

161. No ordinary and objective professional law enforcement officer is the least bit likely to have used deadly force on an unarmed man in the back as he fled.

162.  As a result of these Constitutional violations to DEMARCUS and the injuries he sustained, Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

### COUNT V – CONSPIRACY TO INTERFEAR WITH CIVIL RIGHTS BY DEFENDANT HOLMES (Individually and in his official capacity)

### 42 U.S.C. § 1985

163. Plaintiff incorporates by reference paragraphs 1 through 162 as if fully set forth herein. Plaintiff would show that Defendant HOLMES' actions on the occasion in question were wrongful, malicious and reckless in depriving DEMARCUS of his constitutional rights, as alleged more fully below.

164. Defendants used excessive and deadly force as described above and killed DEMARCUS without legal justification.

165. DEMARCUS never made any threatening gestures toward Defendants, never had a weapon of any kind, and did not pose an immediate threat to the safety of Defendant HOLMES or others.

166. DEMARCUS died as a result of HOLMES and MACNAUGHT acting in concert to violate DEMARCUS' rights.

167. The excessive and deadly force used by Defendants was unreasonable, unjustified and unnecessary under the circumstances.

168. Defendants knew their actions were not reasonable and conspired to conceal their deprivations of Plaintiff's civil rights in order to avoid responsibility.

169. Defendants denied DEMARCUS his right to be free from the use of excessive force in violation of the Fourth Amendment to the United States Constitution by working in concert to skirt a proper review of the shooting by the FPPD, St. Lucie County Sheriff, and the State Attorney.

170. The Defendants conspired to formulate a story as to, among other falsities, how the shooting occurred and specifically how Officer MACNAUGHT purported to believe Plaintiff

had a gun and was threatening him, despite both officers concession that they never saw a weapon of any kind.

171. Prior to the incident, Defendants took additional efforts to ensure neither they nor their vehicles had functional video cameras in an effort to deprive DEMARCUS and other citizens they stopped from having their safety adequately monitored.

172. Defendants also committed a huge number of procedural violations and illegal acts prior to, throughout and after the incident, some of which were part of their conspiracy to avoid accurate review of and responsibility for the killing of DEMARCUS.

173. The officers' actions were not those a competent police officer would take.

174. Defendants embarked on an outrageous course of conduct with a reckless, intentional, deliberately indifferent and conscious disregard that caused DEMARCUS to suffer extreme and severe mental and emotional distress, agony, anxiety and fear for his safety and his life.

175. Defendants' conduct, from the beginning of the incident forward, including HOLMES' failure to protect Plaintiff, revealed a multitude of procedural improprieties and illegal conduct that evidenced a lack of proper training, supervision, and operation.

176. As a result of these Constitutional violations to DEMARCUS and the injuries he sustained, Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## COUNT V – CONSPIRACY TO INTERFEAR WITH CIVIL RIGHTS BY DEFENDANT MACNAUGHT (Individually and in his official capacity)

### 42 U.S.C. § 1985

177. Plaintiff incorporates by reference paragraphs 1 through 176 as if fully set forth herein. Plaintiff would show that Defendant MACNAUGHT'S actions on the occasion in question were wrongful, malicious and reckless in depriving DEMARCUS of his constitutional rights, as alleged more fully below.

178. Defendants used excessive and deadly force as described above and killed DEMARCUS without legal justification.

179. DEMARCUS never made any threatening gestures toward Defendants, never had a weapon of any kind, and did not pose an immediate threat to the safety of Defendant HOLMES or others.

180. Defendant MACNAUGHT's actions in invading the Plaintiff's car and getting into physical altercation with him were obviously disproportionate and unnecessary such that HOLMES' failure to intervene and inform MACNAUGHT that the Plaintiff was pulled over for a minor infraction and stop his aggression towards Plaintiff equated to a conspiratorial act.

181. Defendant HOLMES was not provoked when he fired multiple gunshots at the Plaintiff as he sat in his car, after he pulled the Plaintiff over for speeding, and without a radar reading.  DEMARCUS died as a result of HOLMES and MACNAUGHT'S violations of DEMARCUS' rights, and their firing of weapons at him at him three different times after pulling him over for speeding.

182. The excessive and deadly force used by Defendants was not reasonable, justified, nor necessary under the circumstances – a traffic stop for speeding.

183. Defendants knew their actions were not reasonable, and conspired to conceal their deprivations of Plaintiff's civil rights in order to avoid responsibility.

184. Defendants denied DEMARCUS his right to be free from the use of excessive force in violation of the Fourth Amendment to the United States Constitution by working in concert to skirt a proper review of the shooting by the FPPD and by the State Attorney.

185. The Defendants conspired to formulate a story as to, among other falsities, how the shooting occurred and specifically how Officer MACNAUGHT purported to believe Plaintiff had a gun and was threatening him.

186. A reasonable officer would have recognized that the aforementioned actions were violative of DEMARCUS's clearly established rights.

187. The officers' actions were not those a competent police officer would take.

188.  Prior to the incident, Defendants took additional efforts to ensure neither they, nor their vehicles, had functional video cameras, in an effort to deprive DEMARCUS and other citizens they stopped from having their safety adequately monitored.

189.  Defendants also committed an unconscionable number of procedural violations and illegal acts prior to, throughout, and after the incident, some of which were part of their conspiracy to avoid accurate review of and responsibility for the killing of DEMARCUS.

190.  Defendants embarked on an outrageous course of conduct with a reckless, intentional, deliberately indifferent, knowing and conscious disregard that it, and Defendants' decision to turn a blind eye to the conduct, would cause and, in fact, caused SEMER to suffer extreme and severe mental and emotional distress, agony, anxiety and fear for his safety and his life.

191.  Defendants conduct from the beginning of the incident forward, including their failure to protect Plaintiff, revealed a multitude of procedural improprieties and illegal conduct that was so pervasive so as to evidence a lack of proper training, supervision and operation, discriminatory or other animus and/or a motive to intentionally harm the Plaintiff.

192.  As a result of these Constitutional violations to DEMARCUS and the injuries he sustained, Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## COUNT VI – CONSPIRACY TO INTERFEAR WITH CIVIL RIGHTS BY DEFENDANT FORTPIERCE

### 42 U.S.C. § 1985

193.  Plaintiff incorporates by reference paragraphs 1 through 192 as if fully set forth herein. Plaintiff would show that Defendant FORTPIERCE's actions on the occasion in question were wrongful, malicious and reckless in depriving DEMARCUS of his constitutional rights, as alleged more fully below.

**194.** Defendants killed DEMARCUS without legal justification, as he never made any threatening gestures toward Defendants, never had a weapon of any kind, and did not pose an immediate threat to the safety of Defendant HOLMES or others.

195. Defendant MACNAUGHT's actions of invading the Plaintiff's car and getting into a physical altercation with him were obviously disproportionate and unnecessary such that HOLMES' failure to intervene and inform MACNAUGHT that the Plaintiff was pulled over for a minor infraction and stop his aggression towards Plaintiff equated to a conspiratorial act.

196. DEMARCUS died as a result of HOLMES and MACNAUGHT'S violations of DEMARCUS' rights and their firing of weapons at him at him three different times after pulling him over for speeding.

197. The excessive and deadly force used by Defendants was unreasonable, unjustified and unnecessary under the circumstances.

198. Defendants knew their actions were not reasonable and conspired to conceal their deprivations of Plaintiff's civil rights in order to avoid responsibility.

199. Defendants denied DEMARCUS his right to be free from the use of excessive force in violation of the Fourth Amendment to the United States Constitution by working in concert to skirt a proper review of the shooting by the FPPD and by the State Attorney.

200. Reasonable officers would have recognized that the aforementioned actions were violative of DEMARCUS's clearly established rights.

201. The officers' and Department's actions were not those competent police officers would take.

202. Defendants' actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures for which the city of FORTPIERCE and the FPPD knew or should have known but never provided the requisite and proper training.

33

203. Defendants, acting through official policies, practices, and customs, and with deliberate, callous, and conscious indifference to the constitutional rights of DEMARCUS failed to implement and/or enforce the policies, procedures; and practices necessary to provide constitutionally adequate protection and assistance to DEMARCUS during his struggle to survive and implemented policies, procedures, and practices which actually interfered with or prevented with or prevented DEMARCUS from receiving the protection, assistance, and treatment he deserved.

204. The CITY OF FORT PIERCE and FPPD's failure to adequately train, supervise or discipline its officers who commit a wrongful act or attempt to hide or cover-up a wrongful act of a fellow officer was part and parcel of their conspiring to cover up police responsibility for shootings.

205. The Defendants conspired to formulate a story as to, among other falsities, how the shooting occurred and specifically how Officer MACNAUGHT came to believe Plaintiff had a gun and was threatening him.

206. Prior to the incident, Defendants failed to properly equip their vehicles with functional video cameras in a deliberate effort to deprive DEMARCUS and other citizens they stopped from having their safety adequately monitored.

207. Defendants also committed a huge number of procedural violations and illegal acts prior to, throughout and after the incident, some of which were part of their conspiracy to avoid accurate review of and responsibility for the killing of DEMARCUS.

208. In addition, Defendant CITY OF FORT PIERCE and FPPD failed and refused to implement customs, policies, practices or procedures, and failed to train its personnel adequately regarding the proper use of deadly force. In so doing, Defendant CITY OF FORT PIERCE knew that it was violating the law, and knew that as a direct consequence of their

deliberate decisions, the very situation that occurred – *i.e.*, a citizen's death-- in all reasonable probability would occur.

209. Defendant FORT PIERCE and the FPPD joined with the individual Defendants in conducting sham investigations of the shooting which were designed to exonerate the Department and the officers without regard for the actual facts or the obvious nature of false testimony by the officers.

210. Defendants embarked on an outrageous course of conduct with a reckless, intentional, deliberately indifferent, knowing and conscious disregard that it, and Defendants' decision to turn a blind eye to the conduct, would cause and, in fact, caused SEMER to suffer extreme and severe mental and emotional distress, agony, anxiety and fear for his safety and his life.

211. Defendants' conduct from the beginning of the incident forward, including their failure to protect Plaintiff, revealed a multitude of procedural improprieties and illegal conduct that was so pervasive that it evidenced a lack of proper training, supervision and operation, discriminatory or other animus and/or a motive to harm the Plaintiff.

212. As a result of these Constitutional violations to DEMARCUS and the injuries he sustained, Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## COUNT VII – FAILURE TO TRAIN AND SUPERVISE BY THE CITY OF FORT PIERCE
### 42 U.S.C. § 1983 (Monell claim)

213. Plaintiff incorporates regarding paragraphs 1 – 212 as if fully set forth herein. At all times material prior to the subject incident, the FORT PIERCE Police Department knew or should have known that the Defendant Officers were deficiently trained, supervised

and equipped based on a lack of disciplinary procedure and a failure to educate and train their officers to even a minimally acceptable degree.

214. Defendant the City of FORTPIERCE, under the direction of the Policymakers, developed and maintained a policy of deficient training of its police force in the use of force, including the proper use of deadly force and dealing with individuals during a traffic stop.

215. FORTPIERCE and thee FPPD's failure to provide adequate training to its officers on how to deal with individuals during a stop and the subsequent use of deadly force reflect deliberate indifference by the Policymakers and reckless and conscious disregard for the obvious risk that officers would use excessive or deadly force on citizens and led to the violations of SEMER' constitutional rights, including his death.

228. Defendants' actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures for which the city of FORTPIERCE and the FPPD knew or should have known but never provided the requisite and proper training.

229. On information and belief, Defendants, acting through official policies, practices, and customs, and with deliberate, callous, and conscious indifference to the constitutional rights of SEMER failed to implement and/or enforce the policies, procedures; and practices necessary to provide constitutionally adequate protection and assistance to SEMER during his struggle to survive.

230. Defendant CITY OF FORTPIERCE implemented policies, procedures, and practices which actually interfered with or prevented with or prevented SEMER from receiving the protection, assistance and treatment which he was Constitutionally entitled.

231. For example, the following conduct, policies, and customs by Defendants violated SEMER' constitutional rights:

   a) the City of FORTPIERCE and FPPD's failure to adequately train, supervise or discipline its officers;

36

b) Defendants' policy on the proper use of deadly force;

c) Defendants' inadequate training on how to deal with individuals during a traffic stop;

d) Using physical force and also deadly force against SEMER while he was seated in a vehicle;

e) Using deadly force against SEMER although he caused no immediate threat;

f) Using deadly force while SEMER was fleeing;

g) Using deadly force by shooting SEMER in the back while he was unarmed;

h) Entering SEMER's vehicle through the passenger's door;

i) Entering a vehicle without permission or a warrant;

j) Secretly opening the passenger door of a passenger vehicle to conduct an illegal search;

k) Consciously failing to supply and utilize dash or body cams to either officer; and

l) The FPPD failed to observe proper police procedure or adequately supervise and train its officers to do so.

234. In addition, Defendant City of FORTPIERCE and FPPD failed and refused to implement customs, policies, practices or procedures, and failed to train its personnel adequately regarding the proper use of deadly force. In so doing, Defendant City of FORTPIERCE knew that it was violating the law, and knew that as a direct consequence of their deliberate decisions, the very situation that occurred -- *i.e.*, a citizen's death-- in all reasonable probability would occur.

235. The Department participated and allowed its officers to participate in the manipulation of evidence, evidence gathering and presentation in a wrongful act or attempt to hide or cover-up the wrongful nature of the subject shooting by a fellow officer, which serves as further evidence of the pattern of disregard for observance of constitutional norms and protections.

236. A Department operated in a reasonable manner would have recognized that the aforementioned actions were violative of MR. SEMER's clearly established rights.

37

237. The Department's actions were not those competent police officers would take.

238. 157.    The City of FORTPIERCE's failure to properly train, supervise and discipline its deputies was the proximate cause of the violations of SEMER' constitutional rights.

### VIII.        ASSAULT AND BATTERY – DEFENDANT CITY OF FORTPIERCE
#### (Vicarious Liability)

239. Plaintiff incorporates by reference paragraphs 1 through 65 as if fully set forth herein and states as follows:

240. The officers Defendants both assaulted MR. SEMER and Defendant MACNAUGHT also committed battery against him on numerous occasions.

241. HOLMES caused the Plaintiff to anticipate being struck by a bullet or bullets by intentionally firing his service weapon at him without provocation or cause, thus constituting Assault.

242. Without justification, the discharge of his weapon was unauthorized and illegal and may not be excused by virtue of his status as an officer.

243. Defendant MACNAUGHT also assaulted MR. SEMER when he invaded his car, as this was an intentional act that caused SEMER to anticipate that the officer was going to make an unauthorized physical contact imminently.

244. Defendant MACNAUGHT also committed battery against MR. SEMER when he attacked him physically in his vehicle, then again when he hit him with his Taser, and then a third time when he killed him by shooting him in the back while he ran away.

245. MACNAUGHTS actions were all unjustified and thus illegal such that his status as a police officer does not serve to relieve him of any responsibility for them.

246. Each assault and battery caused the Plaintiff damages as detailed below.

247. The Defendant officers were both employees of Defendant City of FORTPIERCE at the time of the incident such that the City is vicariously liable for these torts and responsible for the damages flowing from them.

248. As a result of these violations and the injuries he sustained, Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## IX. NEGLIGENCE – DEFENDANT CITY OF FORTPIERCE (Vicarious Liability)

249. Plaintiff incorporates by reference paragraphs 1 through 248 as if fully set forth herein and states:

250. The Defendants owed MR. SEMER a duty of care which included protecting him from unreasonable harm which they perceive and are able to protect him from and included avoiding causing him unnecessary harm.

251. Defendants acted negligently in causing MR. SEMER harm and in failing to protect him from harm, including from one another, they easily could have and ought to have.

252. Defendant FORTPIERCE is vicariously liable for the negligence of the Defendant officers by virtue of their employment.

253. Defendants' negligence caused injury to MR. SEMER, including his death, and as further detailed below.

254. As a result of these violations the injuries he sustained, Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## PUNITIVE/EXEMPLARY DAMAGES

255. Plaintiff incorporates by reference paragraphs 1 through 254 as if fully set forth herein. Plaintiff requests punitive and exemplary damages. The heedless and reckless disregard of MR. SEMER' rights, safety and welfare was more than momentary thoughtlessness, inadvertence or misjudgment. Such unconscionable conduct goes beyond ordinary negligence, to deliberate action and inaction, and as such Plaintiff requests punitive and exemplary damages are awarded against Defendants in a sum which is within the jurisdictional limits of this court.

**SURVIVAL ACTION**

256.   Plaintiff incorporates by reference paragraphs 1 through 255 as if fully set forth herein.

257.  CLEO H. SMITH is the Personal Representative for the Estate of DEMARCUS SEMER.

258.  SEMER died as a result of the Defendants' wrongful conduct.

259.  SEMER would have been entitled to bring this action against the Defendants if he had

       lived.

260.  The decedent's right of action for the wrongful conduct against the Defendants survive in

       favor of heirs, legal representatives, and the estate of the deceased.

261.  Defendants are liable to Plaintiff for the mental anguish and pain and suffering suffered

       by the Plaintiff, as he perceived the end of his life drawing near by virtue of the

       Defendants' violations of his civil rights through excessive force and with discriminatory

       intent throughout the subject incident. Plaintiff seeks compensation as set forth more

       specifically in the section of this Complaint entitled "Damages."


**WRONGFUL DEATH**


262.  Plaintiff incorporates by reference paragraphs 1 through 261 as if fully set forth herein.


263.  Defendants are liable for damages by virtue of the wrongful death of Mr. SEMER to MR.

       SEMER's Estate and to his mother LATRICIA MIDDLETON, the survivor of his Estate.


264.  Defendants' aforementioned conduct was the legal and proximate cause of SEMER's

       death, which resulted in the following damages to the ESTATE: loss of future earnings,

loss of net accumulations, medical bills, and pain and suffering and mental anguish

suffered by SEMER prior to his death and funeral expenses

265.  Plaintiff also seeks compensation from Defendants for the following damages, both

in the past and future, for LATRICIA MIDDLETON:

a. loss of affection,

b. loss of support and services,

c. emotional pain and suffering,

d.  mental anguish;

e. Loss of consortium, comfort, financial assistance, protection, and care;

f.; loss of a child;

g.  Loss of future earnings and contributions to Plaintiff;

h.   Exemplary and punitive damages as well as costs of court;

i.  Attorneys' fees pursuant to Title 42 USC § 1988.

j. Prejudgment interest; and

k. Post judgment interest.

## COSTS AND ATTORNEY FEES

272. Plaintiff incorporates by reference paragraphs 1 through 265 as if fully set forth herein.

Plaintiff is entitled to an award of attorney fees and costs under Title 42 USC § 1988.

## TRIAL BY JURY

273.  Plaintiff demands trial by jury.

## PRAYER

WHEREFORE, Plaintiff prays for judgment from Defendants; actual damages, exemplary

damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate;

costs of court; and such other and further relief, both general and special, at law and in

equity, to which Plaintiff is justly entitled.


Respectfully Submitted,


*s/ Lorenzo Williams*
Lorenzo Williams
Gary, Williams, Parenti, Watson and Gary, PLLC
Attorney for the Plaintiff


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY that on April 20, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.**




## SERVICE LIST
**Cleo Smith as Personal Representative of the Estate of Demarcus Semer
v. City of Fort Pierce et al.**


**Lorenzo Williams, Esq.
Florida Bar No. 249874
GARY, WILLIAMS, PARENTI, WATSON AND GARY. P.L.L.C.
221 S.E. Osceola Street
Stuart, Fl. 34994
Phone- 772-283-8260
Facsimile-772-287-8494
Email-lw@williegary.com
tcp@williegary.com**